Filed 10/9/25  P. v. Monge CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082458 |
| v. | (Super.Ct.No. FSB22002140) |
| ALEX MONGE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Liz Olukoya, and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Alex Monge of second degree murder and found that he personally used and discharged a firearm in killing Samuel Zavala. On appeal, Monge argues that the trial court prejudicially erred by excluding any evidence, including expert testimony, about the postmortem presence of methamphetamine in Zavala's blood. In addition, Monge contends that the trial court prejudicially erred by instructing the jury that (1) a person who provokes a fight with an intent to create an excuse to use force does not have a right to self-defense (CALCRIM No. 3472) and (2) the right to self-defense extends only so long as the danger exists or reasonably appears to exist (CALCRIM No. 3474). We affirm.

BACKGROUND

At trial, Monge admitted that he shot and killed Zavala.

I.      *The killing*

On the night of July 18, 2022, Monge and his younger brother, Hector G., went to a Little Caesars restaurant to buy dinner. Hector waited in the car while Monge went into the restaurant to order food.

The restaurant has an interior security camera mounted above and behind the counter, so it captures the area accessible to the public inside of the restaurant and also the glass door and plate glass windows at the front, through which the parking lot is visible. Little Caesars provided law enforcement with a copy of the surveillance footage from the night of July 18, 2022, and the recording was admitted into evidence and played

2

for the jury. Our description of the facts is based in part on our review of the video recordings.

Zavala drove to the same Little Caesars with two of his friends, Dominick R. and Corrine P., and arrived when Monge was inside the restaurant. Monge exited the restaurant as Dominick was entering. In an interview with law enforcement the night of the killing, Dominick said that Monge hit him with the door as he was walking out. Dominick said something like, "[W]atch where you walk," "weirdo." At trial, Dominick could not recall the details of what happened, because he was high and "under the influence of meth" on the night of the incident.

As Monge exited the restaurant, he turned toward Dominick for a moment but then continued walking away, and Dominick walked into the restaurant while looking over his shoulder at Monge. Monge stopped, turned toward Dominick, and said something. Dominick then exited the restaurant, and Dominick and Monge walked toward one another. Monge put down the soda that he was carrying, and Dominick did the same.

Monge and Dominick stood facing one another on the sidewalk, and Zavala got out of his car, which was parked directly in front of and facing them. All three men walked away from the restaurant. Hector then ran toward the group while pointing a gun at Dominick and Zavala.

Hector had watched the exchange between Monge and the two men from inside Monge's parked car. After Zavala exited his car, Hector described Dominick and Zavala as "try[ing] to rush my brother, to jump him," which is when Hector remembered that

3

there was a gun inside of Monge's car near the cupholder. Hector grabbed the gun, "clipped it back" (meaning that he loaded a cartridge into the chamber, or believed that he had), got out of the car, and started yelling, "'[b]ack up'" and "back the fuck off" while pointing the gun at the two men to scare them away.

Both Dominick and Zavala backed away from Hector. Monge ran toward Hector and took the gun from him. Monge then headed back toward the restaurant with the gun held out in front of him. Monge pointed the gun toward Dominick and Zavala and picked up his soda from the sidewalk.

While all four men were standing on the sidewalk in front of the restaurant, another car pulled up and parked two spaces away from Zavala's. Hector and Monge walked into the parking lot, and the driver of the car that had just arrived, Salina F., got out of her car and stood on the sidewalk in front of the restaurant. Monge then returned and entered the restaurant, holding the gun at his side and then putting it inside the pocket of his shorts.

Less than one minute later, Monge left the restaurant again without a pizza. Zavala was standing on the sidewalk in front of the restaurant when Monge exited, and Zavala then walked alongside Monge as Monge headed down the sidewalk. Monge then entered the parking lot by walking around the far side of Salina's parked car, while Zavala walked around the other side of the car.

Salina exited the restaurant, walked toward her car, and told everyone to stop doing what they were doing because her children were in the car. She was worried

4

because Monge "got loud or something." Salina could not recall what anyone said, except that Monge "felt disrespected," "jump[ed] up and down," yelled, and was "really mad." Zavala and Dominick were "calm," talking loudly, not shouting, and not acting threatening.

Zavala made his way around the car before Monge and quickly closed the distance between himself and Monge. Zavala stopped directly in front of Monge, who backed away from Zavala. Zavala next turned his back to Monge, and a muzzle flash is visible immediately thereafter. Zavala then ran away from Monge, who followed him. Another muzzle flash is visible while Monge pursued Zavala.

When Monge shot Zavala, Kimberly H. was parked at a stoplight at the adjacent street corner. She had an unobstructed view of Monge and Zavala in the well-lit parking lot.[1] She initially saw the two men exchanging words while standing approximately two feet apart. She later saw Monge take a gun from his waistband and shoot Zavala, who was unarmed. Kimberly did not see Zavala lunge toward Monge or make any other physical movements toward Monge before being shot. When Monge shot Zavala, Zavala's hands were hanging by his side in a normal standing position. After Zavala was shot, he stumbled backward and fell face down onto the ground.

Kimberly pulled into the parking lot as the shooter drove away. Corinne called 911.

---

[1] Kimberly pulled into the parking lot after the shooting and saw the shooter as he was pulling out of the lot. But she did not identify Monge in court. Because Monge admitted that he shot Zavala, we nevertheless refer to the person that Kimberly saw shoot Zavala as Monge.

II.     *The investigation*

Immediately after the shooting, Monge and Hector drove to their home near the restaurant. Monge's older brother, Denny M., was at home. Denny described Hector and Monge as nervous and afraid. Monge repeatedly told Denny, "'I shot somebody,'" and "'They were trying to jump me.'" Monge told Denny that he did not want to shoot, but he believed that he did not have a choice because "they" were going to jump him. But Denny confirmed that Monge also told him that he was unsure about whether they were going to jump him.

Law enforcement arrived at Monge's house shortly after Monge and Hector and detained Monge and his siblings. Law enforcement searched the residence the next morning and found three firearms in Monge's bedroom, including two Glock nine-millimeter semiautomatic handguns, along with "a couple hundred" nine-millimeter rounds. Denny identified the handguns as belonging to Monge. Law enforcement found seven nine-millimeter cartridge casings at the scene of the killing. A criminalist tested the casings and concluded that they matched one of the nine-millimeter guns found in Monge's bedroom. Detectives testified that a semiautomatic firearm requires the shooter to pull the trigger every time a shot is fired.

III.    *Zavala's body*

The first law enforcement officers to arrive at Little Caesars after the shooting found Zavala face down on the ground and unresponsive. Zavala was pronounced dead at the scene. The chief forensic pathologist for the San Bernardino County Sheriff's

6

Department performed an autopsy of Zavala's body four days after Zavala died.  The pathologist concluded that Zavala died as a result of gunshot wounds.

There were nine entry wounds (excluding reentry wounds) on Zavala's body: three to his chest, one to his mandible (exiting through his chin and reentering through his upper chest or shoulder), four to his back, and one to his right hand.  Five of the wounds were fatal, including three of the wounds to Zavala's back.  None of the entry wounds had any soot or stippling, so they were all shot from a distance of at least 24 inches.

IV.     *Defense evidence*

Both Monge and Hector testified for the defense.  In addition, several character witnesses testified on Monge's behalf.

Monge did not see Dominick when he opened the door at Little Caesars, and Monge apologized to Dominick when the door hit him.  Monge was irritated when Dominick told him to watch his back, and Monge wanted to confront Dominick by talking to him.  But before Monge could say anything, Zavala got out of a car and said, "'What's up, fool?  What's up?'"  Dominick and Zavala advanced toward Monge, who feared for his life because he believed that he was going to "get jumped."

Hector then brought Monge his gun.  Monge did not want to hurt anybody but unjammed the weapon to ensure that Dominick and Zavala would take him seriously.  Monge did not leave after he was given the gun, because he wanted his pizza.  While walking toward the restaurant, Monge pointed the gun at Dominick and Zavala because their appearance led him to believe that they might be armed.  But Monge never saw

7

either man with a weapon. Monge said that he apologized to Dominick and Zavala while he was pointing the gun at them and felt mad and afraid when he went back inside of the restaurant to get his pizza. When the pizza was not ready, Monge just gave up and headed toward his car, wanting to go home.

When Monge left the restaurant, he "felt really threatened" when Zavala followed him out into the parking lot. Monge was afraid, and he claimed that when Zavala approached him in the parking lot, Zavala lunged forward and attempted to get the gun from inside Monge's pocket. Zavala's hand got "really close" to Monge's pocket. Monge took a step back because Zavala "almost" got his gun.

Monge "just reacted" by taking a step back and starting to shoot. He "just kept on shooting" without pausing. Monge admitted on cross-examination that a portion of the recording showed Monge shooting at Zavala while Zavala was running away. Monge said that he was not aiming when he fired the gun and believed that he was not hitting Zavala with any bullets. Monge said that he was afraid of Zavala when he fired each shot, even when Zavala's back was turned toward him. Monge said that he did not want to kill Zavala when he shot at him. Monge was afraid throughout the entire encounter. He admitted that he had multiple opportunities during the encounter to leave the parking lot but did not.

DISCUSSION

I.     *Alleged evidentiary error*

Monge argues that the trial court prejudicially erred by excluding any evidence about the presence of methamphetamine in Zavala's blood when he died.  We find no prejudice.

A.     *Legal framework*

 "A criminal defendant has the right to present the testimony of witnesses in his or her defense, subject to a court's application of ordinary rules of evidence which generally does not infringe on a defendant's right to present a defense."  (*People v. Chavez* (2018) 22 Cal.App.5th 663, 680.)  Relevant evidence is generally admissible at trial but may be excluded under Evidence Code section 352.  (Evid. Code, §§ 210, 350, 352; unlabeled statutory references are to this code.)  Section 352 grants the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Section 801 allows expert opinion testimony on matters that are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (*Id.*, subd. (a).)  The court retains discretion to admit or exclude expert testimony under section 352.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1008, superseded by statute on other grounds as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.)

We review for abuse of discretion the trial court's ruling on the admissibility of evidence, including expert testimony. (*People v. Waidla* (2000) 22 Cal.4th 690, 717; *People v. Duong* (2020) 10 Cal.5th 36, 60.) State law error in the exclusion of evidence is reviewed for harmlessness under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 (*Cunningham*).) The error is harmless unless there is a reasonable probability that the jury would have reached a result more favorable to the defendant absent the error. (*Watson*, at p. 836.)

B.     *Relevant proceedings*

Before trial, Monge moved to admit the expert testimony of a pathologist and toxicologist, Dr. Marvin Pietruszka, M.D., whom Monge proffered would testify about the level of methamphetamine present in Zavala's blood when he died and how methamphetamine can cause a person to act aggressively.[2] The prosecution moved under section 352 to exclude any evidence of the presence of drugs in Zavala's blood taken postmortem, because it "would only serve to improperly sully the victim's reputation here in an apparent effort to minimize the defendant's culpability." The trial court reserved ruling on the issues until after the prosecution presented its case-in-chief, reasoning that the relevance of the evidence depended on whether there was any evidence that Zavala acted aggressively.

---

[2]     Defense counsel initially moved to have Dr. Pietruszka also testify about the effects of PCP, but counsel withdrew that motion when the prosecution objected that the toxicology report did not reveal that Zavala had taken any PCP.

After the prosecution rested, the trial court held a section 402 hearing on the admissibility of the expert testimony. Dr. Pietruszka is the director of a toxicology laboratory, a medical doctor, a board-certified pathologist, and a board-certified toxicologist, with master's degrees in forensic toxicology and applied toxicology. He explained that toxicology "involves the effects of drugs, effects of chemicals, medications, and other substances on human bodies."

Dr. Pietruszka had reviewed the police reports and also the toxicology results in the forensic pathologist's autopsy report. Dr. Pietruszka confirmed that Zavala's blood taken during the autopsy tested positive for methamphetamine, with a level of 250 nanograms. He opined that this level is "on the lower range of toxicity." The tested blood sample was taken from Zavala's chest.

Dr. Pietruszka explained that methamphetamine is a psychotomimetic drug that stimulates the central nervous system and the brain and affects cognition. It "makes a person more alert, [and] raises the individual's energy, essentially." Methamphetamine alters a person's ability to think clearly, and users "may become more aggressive and have emotional outrage or become more confused, they may develop paranoia, hallucinations." A person under the influence of methamphetamine may feel "quite strong" and "able to accomplish whatever [they] want to accomplish physically. They feel stronger. Their muscles intense." Dr. Pietruszka opined that "[t]here is a high incidence of violence in individuals who utilize methamphetamine, very grave incidence of death in methamphetamine users."

11

Dr. Pietruszka explained that as a result of something called "postmortem redistribution," measurements of the level of methamphetamine in a person's blood taken postmortem may not be 100 percent accurate. In particular, blood samples taken from the heart or chest are less accurate than those taken from femoral blood. Dr. Pietruszka opined that a sample taken from the chest four days after death "would be higher than a peripheral sample" and higher than the actual level of methamphetamine in the person's blood when they died. Dr. Pietruszka opined that if the postmortem measurement was close to accurate, then Zavala likely ingested the methamphetamine within one or two days before he died.

Dr. Pietruszka opined that the mere presence of methamphetamine in a person's body means that it is having an effect on the person. He added: "[W]hat we know from looking at this test result is that this individual had the drug in his system. It was not a very high number, but it would have had some effect."

The court sustained the prosecution objection to Dr. Pietruszka's testimony on the grounds that it lacked foundation and was irrelevant and that the prejudicial effect of the testimony substantially outweighed any possible probative value under section 352. The court reasoned that the positive result of methamphetamine in Zavala's blood had "almost no probative value," because it was not necessary to make the point that Zavala acted aggressively or reached for Monge's gun, if that evidence was introduced.

12

C.    *The toxicology report*

Monge first argues that the trial court abused its discretion by not admitting the toxicology report because its relevance is a matter of common knowledge, not requiring expert testimony.  The argument is forfeited because Monge did not advance it in the trial court.  (*People v. Harris* (2005) 37 Cal.4th 310, 341.)  The argument also fails on the merits.

"The effect of drugs, while certainly a proper subject of expert testimony, has become a subject of common knowledge among laypersons."  (*People v. Yeoman* (2003) 31 Cal.4th 93, 162.)  If "'the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.'"  (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.)  Nevertheless, while "expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant."  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)  "Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony."  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131 (*DeHoyos*).)

Assuming for the sake of argument that the general effect of methamphetamine was within the jury's common knowledge, expert testimony was necessary to assist the jury on the possible effect of methamphetamine on Zavala in the present case.  The toxicology report revealed that Zavala had 250 nanograms of methamphetamine in his

13

blood four days after he died. Dr. Pietruszka opined that because of postmortem distribution and because the blood sample was taken from Zavala's chest, the measurement was not accurate and was likely higher than the actual amount of methamphetamine in Zavala's blood when he died. Interpreting the meaning of that level of methamphetamine in a blood sample taken from the chest four days after death could not reasonably be understood to be within the common knowledge of the jury. Instead, the import of the toxicology report is the subject of particular scientific knowledge that goes beyond whatever common knowledge about the general effects of methamphetamine the jury may have. Admission of the toxicology report therefore was not admissible without expert testimony. (*DeHoyos*, *supra*, 57 Cal.4th at p. 131.)

For these reasons, we conclude that had Monge argued in the trial court that the toxicology report was admissible without expert testimony, the trial court would not have abused its discretion by excluding the evidence.

D. *Expert testimony*

Monge also argues that the trial court prejudicially erred by excluding Dr. Pietruszka's testimony. We need not address the merits of the admissibility issue, because assuming that the trial court erred by excluding the testimony, any such error was not prejudicial.

There was conflicting testimony about whether Zavala reached for Monge's gun before Monge shot Zavala. Monge's claim of self-defense depended on the jury believing Monge's account of the incident. Dr. Pietruszka's testimony could have

14

supported the defense theory that Monge acted in self-defense by explaining why Zavala might have felt emboldened to reach for Monge's gun, thus making Monge and Hector's account of the incident seem more credible.

Despite the relevance of Dr. Pietruszka's testimony, it is not reasonably probable that the jury would have reached a more favorable result for Monge if the evidence had been admitted. Regardless of whether Zavala reached for Monge's gun before Monge shot him, the video recording shows Zavala turning after one muzzle flash and running away from Monge. Monge then follows Zavala as he flees and another muzzle flash is visible. Moreover, the pathologist testified that Monge shot Zavala four times in the back, and three of those gunshot wounds were fatal. As the jury was instructed (see *post*), Monge's right to use force in self-defense ceased when Zavala withdrew from the attack, turned around, and fled. (*People v. Perez* (1970) 12 Cal.App.3d 232, 236 (*Perez*); CALCRIM No. 3474.)

Given that (1) Zavala's withdrawal is apparent in the video recording of the incident, (2) Monge is seen following Zavala after he turned and ran away, (3) Monge is seen shooting Zavala in the back, and (4) Zavala suffered four gunshot wounds to the back (three of which were fatal), it is not reasonably probable that the jury would have concluded that Monge acted in lawful self-defense. Consequently, any error in excluding Dr. Pietruszka's testimony was harmless. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) In addition, because the trial court excluded only some of the evidence supporting Monge's claim of self-defense and did not otherwise preclude him from presenting the

defense, we reject Monge's contention that the claimed error amounted to a federal constitutional error warranting review under the more stringent harmlessness standard in *Chapman v. California* (1967) 386 U.S. 18, 24. (*McNeal*, at p. 1203; *Cunningham*, *supra*, 25 Cal.4th at p. 999.)

II.   *Alleged instructional error*

The trial court gave the jury the standard instruction on self-defense contained in CALCRIM No. 505, along with the optional additional instructions on self-defense contained in CALCRIM No. 3472 and CALCRIM No. 3474. As it was given to the jury, CALCRIM No. 3472 reads: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." CALCRIM No. 3474 advised the jury as follows: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." Monge contends that the record does not contain substantial evidence to support giving either instruction. The contention lacks merit.

As Monge acknowledges, CALCRIM No. 3472 and CALCRIM No. 3474 are correct statements of the law. (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333 (*Eulian*) [CALCRIM No. 3472]; *Perez*, *supra*, 12 Cal.App.3d at p. 236 [legal principle in CALCRIM No. 3474].) "'[T]he ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack

16

or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.'" (*People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*).) In addition, because the right to self-defense is based on the appearance of imminent peril to the person being attacked, "[w]hen that danger has passed and the attacker has withdrawn, there can be no justification for the use of further force." (*Perez*, at p. 236.)

In criminal cases, the trial court is obligated to instruct the jury sua sponte on general principles of the law that are relevant to the issues raised by the evidence. (*People v. Lujano* (2017) 15 Cal.App.5th 187, 191.) Pinpoint instructions connect specific facts to a legal issue involved in the case. (*Ibid.*) Such instructions are required to be "'''given upon request when there is evidence supportive of the theory.'''" (*Ibid.*) But "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We independently review the propriety of giving a jury instruction. (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199.)

First, substantial evidence supported instructing the jury with CALCRIM No. 3474 that the right to use force ends when the attacker either withdraws or no longer appears capable of inflicting any injury.[3] Monge shot Zavala four times in the back. The

---

[3] The People argue that Monge forfeited any argument about CALCRIM No. 3474 by not raising it in the trial court. The trial court stated that during an off-the-record instructions conference the parties discussed CALCRIM No. 3474. But the court did not say whether Monge objected during that conference, and Monge's counsel did not object when the court mentioned the instruction on the record. It is not clear from the record

*[footnote continued on next page]*

video recording of the incident shows Zavala turning around and running away from Monge after one muzzle flash, with Monge following after the fleeing Zavala while the muzzle flashes again. Given that evidence, instructing the jury with CALCRIM No. 3474 was warranted. (*People v. Martin* (1980) 101 Cal.App.3d 1000, 1010 [similar CALJIC instruction "clearly warranted by the evidence that the victim was shot in the back"].)

Monge's only argument to the contrary is that there was no evidence that Zavala withdrew before Monge started shooting. The argument fails because even if Zavala withdrew after Monge started shooting, CALCRIM No. 3474 still applies. The video shows that Zavala turned and fled after Monge started shooting him, and the forensic evidence confirms that Zavala was repeatedly shot in the back. Monge had to pull the trigger every time he fired a shot. His right to use force in self-defense by firing at Zavala ended when Zavala withdrew, so the jury was correctly instructed with CALCRIM No. 3474.

Second, substantial evidence also supported instructing the jury with CALCRIM No. 3472. The jury could reasonably infer from the evidence that Monge provoked the conflict with Dominick and Zavala "with the intent to create an excuse to use force." (CALCRIM No. 3472; *Enraca*, *supra*, 53 Cal.4th at p. 761.) After Monge and Dominick initially encountered each other at the door of the restaurant, Dominick entered the restaurant while Monge turned toward Dominick and placed his soda on the ground,

whether Monge objected to CALCRIM No. 3474 during the off-the-record portion of the conference. In any event, even if Monge forfeited the argument, we would exercise our discretion to consider it. (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016, fn. 12.)

18

while walking toward Dominick. Then, after Monge walked away from the encounter with Zavala and Dominick and ran to get his gun from Hector, Monge reinitiated contact with Zavala and Dominick by pointing the gun at the unarmed men while advancing toward them. The jury was free to disbelieve Monge's account that he feared for his life or that he stayed for the sole purpose of getting his pizza and soda. (*People v. Wilson* (2005) 36 Cal.4th 309, 329 ["A trier of fact could have reasonably rejected portions of [the] defendant's self-serving testimony"].) The jury instead could reasonably infer from the evidence that Monge chose to escalate the verbal altercation in order to provoke a physical fight to create an excuse to use the gun. That inference is consistent with the inference that Monge also wanted his pizza and soda, and it is further supported by Salina's testimony that Monge was the only person who was visibly upset. From all of this evidence, the jury could reasonably infer that Monge provoked the conflict with Dominick and Zavala with the intent to create an excuse to use force and in particular to use the gun that he brought with him. Monge "did not have the right to use force to settle a physical confrontation he arguably created." (*Eulian, supra*, 247 Cal.App.4th at p. 1334; *Enraca*, at p. 761.) There accordingly was substantial evidence to support instructing the jury with CALCRIM No. 3472.

Monge's argument to the contrary is unavailing. He focuses exclusively on evidence that Zavala and Dominick were the aggressors throughout the encounter. The existence of contrary evidence does not show that there was not substantial evidence that Monge provoked the conflict. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1143

[reviewing court "must view the record favorably to the judgment below to determine whether there is evidence to *support* the instruction, not scour the record in search of evidence suggesting a contrary view"].)

For these reasons, we conclude that substantial evidence supported instructing the jury with CALCRIM No. 3472 and CALCRIM No. 3474.

III.    *Cumulative error*

Monge contends that the combination of claimed errors raised in this appeal rendered his trial fundamentally unfair and thus requires reversal.  "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'"  (*Cunningham*, *supra*, 25 Cal.4th at p. 1009.)  Given our conclusion that there was no instructional error, there was no cumulative error.  (*Ibid.*)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                                            MENETREZ_____
                                                                                    J.
We concur:


McKINSTER_____
             Acting P. J.


MILLER_____
             J.

20